# In the United States Court of Federal Claims

No. 14-783C
(Filed: March 31, 2017)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| KAREN L. SHAW, individually, and | \* | |
| KAREN L. SHAW, as Guardian of the | \* | RCFC 56; Summary Judgment; Federal |
| person of RICHARD SCOTT SHAW, an | \* | Tort Claims Act, 28 U.S.C. § 1346; Breach |
| incompetent, and RAYMOND A. SHAW, | \* | of Contract; Latent Ambiguity; Contra |
| individually, | \* | Proferentem |
| | \* | |
| Plaintiffs, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Charles M. Granoski , Jr., Takoma, WA, for plaintiffs.

Mollie Lenore Finnan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court are the parties' cross-motions for partial summary judgment on the issue of liability pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiffs, Karen and Raymond Shaw, allege that the United States breached an agreement executed by the parties to settle claims made by plaintiffs pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680 (2012). The court deems oral argument unnecessary and, for the reasons set forth below, denies plaintiffs' motion and grants defendant's motion.

## I. BACKGROUND

Plaintiffs, both residents of Pierce County, Washington, are the parents of Richard Scott Shaw, who was born on July 4, 1979, at Madigan Army Medical Center in Takoma, Washington.[1] Compl. ¶¶ 2.1, 2.3, 2.6. During his birth, Richard suffered massive injuries,

---

[1] The Court derives the facts, which are undisputed, from plaintiffs' complaint, the exhibits attached to plaintiffs' motion for partial summary judgment, and defendant's cross-motion for partial summary judgment.

which his parents attributed to medical malpractice.  Id. ¶ 2.7.  Following Richard's birth, plaintiffs filed an FTCA claim for damages with the United States Army.  Id. ¶ 2.8.  Thereafter, on March 1, 1982, plaintiffs filed suit against the United States in the United States District Court for the Western District of Washington.  Id.  After a bench trial, judgment was entered against the United States for $11.7 million.  Id.  On August 31, 1984, following an appeal to the United States Court of Appeals for the Ninth Circuit, judgment was reversed and the case was remanded to the trial court.  Id.  While the case was on remand, the parties reached a settlement agreement, which was approved by the trial judge on January 24, 1985.  Id. ¶ 3.1.  The settlement agreement provided, in pertinent part:

> 3.    The plaintiffs agree to accept the compromise and settlement set forth below in full settlement and satisfaction of any and all claims and demands which they, their heirs, executors, administrators or assigns may have or hereafter acquire against the United States of America, its agencies, agents, servants or employees, on account of the events, circumstances or incidents giving rise to this lawsuit and claims incident thereto.

> 4.    The payment by the United States of America of the cash sums set forth below in paragraph 5 and the purchase of annuities which will to [sic] provide certain future periodic payments as set forth below in paragraph 6 shall constitute a complete release and bar to any and all causes of action, claims, liens, rights, or subrogated interests under the Federal Tort Claims Act, or otherwise, known or unknown to the Plaintiffs or their attorneys, by reason of, or arising from, the events, circumstances or incidents giving rise to this lawsuit.  Said annuities will be owned solely and exclusively by the United States of America and will be purchased as soon as practicable following the execution of this Stipulation.  In addition, the United States of America will establish an Irrevocable Reversionary Medical Care Trust for use and benefit of Richard Scott Shaw.  Upon the death of Richard Scott Shaw the Trust Estate shall revert to the United States.  Plaintiffs further agree to reimburse, indemnify and hold harmless the United States of America, its agents, servants, or employees from any and all such causes of action, claims, liens, rights or subrogated interests and, further, to reimburse or advance, at the option of counsel for the United States, any expense or cost which may be incurred incident to or resulting from further litigation or the prosecution of claims by the Plaintiffs against any third party.

5.      The Defendant, United States of America, will make the following payments:

(a)     To Raymond A. Shaw and Karen L. Shaw, jointly, the sum of $500,000.00.

(b)     To the Trustee of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust the sum of $500,000.00.

(c)     To counsel for the plaintiffs, as attorneys' fees, the following:

* * *

(d)     To Merrill Lynch Settlement Services, Inc. [("MLSS")], for the purchase of annuities that will provide the periodic or other payments set forth in paragraph 6, below, the sum of $2,950,000.00.

6.      The annuities purchased by the United States of America shall make the following payments:

(a)     To Raymond A. Shaw, the sum of $4,166.00 each month, continuing for the life of Raymond A. Shaw. These monthly payments are guaranteed for a period of twenty (20) years . . . .

(b)     To Karen L. Shaw, the sum of $4,166.00 each month continuing for the life of Karen L. Shaw. These payments are guaranteed for a period of twenty (20) years . . . .

* * *

(d)     To Richard Scott Shaw, through his guardians ad litem or other appointed representative(s), the sum of $10,000.00 each month, increasing at four percent (4%), compounded annually, continuing for the life of Richard Scott Shaw.

(e)     To the Trustee of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust, the sum of $10,000.00 each month, increasing at four percent (4%), compounded annually, continuing for the life of Richard Scott Shaw.  In addition,

commencing at the end of the twenty-fifth (25th) year, the annuity will provide the sum of $26,658 each month, increasing at four percent (4%) compounded annually, for the life of Richard Scott Shaw, and the following lump sums: . . . the sum of $785,000.00 at the end of thirty (30) years; the sum of $1,250,000.00 at the end of thirty[-]five (35) years; and the sum of $2,000,000.00 at the end of forty (40) years.

\* \* \*

7.      In exchange for payment of the sums set forth in paragraph 5 and contemporaneous with the delivery of the checks therefor, plaintiffs shall file with the Clerk of the Court, a dismissal of this action with prejudice and without costs, expenses or interest. . . .  This compromise settlement is contingent on a total, final cost of $4,800,000.00.

Pls.' Mot., Ex. 5 ("Settlement Agreement") 64-68.

On January 11, 1985, MLSS, acting on behalf of the United States as its broker, purchased four annuities from Executive Life of New York ("ELNY") at a cost of $2,846,095. Def.'s Resp. & Cross-Mot. 6.  Each of the annuity applications listed MLSS as the owner of the annuity, contrary to the terms of the settlement agreement.  Id.

On February 7, 1985, the United States executed the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust Agreement with First Interstate Bank of Washington (now Wells Fargo Bank).  Compl. ¶ 3.7.  The trust agreement provided, in pertinent part:

<u>RECITALS</u>

\* \* \*

Pursuant to the terms of the Stipulation for Compromise Settlement, the defendant, United States of America has agreed to create and establish a Trust for the use and benefit of Richard Scott Shaw, a minor and incompetent, subject to certain limitations and conditions; namely, that the Trust is intended to provide reasonable and necessary medical, institutional and related care and services to the Beneficiary, Richard Scott Shaw, during his lifetime, and that upon the death of Richard Scott Shaw, the Trust Estate (including all accrued or unexpended income) shall revert to the Trustor, United States of America.

\* \* \*

ARTICLE IV
TRUSTEE MANAGEMENT PROVISIONS

The Trustee of the Trust created hereunder shall have and exercise the exclusive management and control of such Trust, and shall have the power and authority necessary for the proper administration and distribution thereof.  In addition to the powers granted to the Trustee by applicable state and Federal law and the several powers granted to the Trustee by other provisions hereof, and not in limitation thereof, the Trustee shall have the following rights and powers in the administration of any Trust created hereunder during the term of such Trust and for division and distribution after its termination:

* * *

(e)     To collect, receive, and receipt for any principal or income and to enforce, defend against, compromise or settle any claims by or against the Trust.

* * *

(i)     The Trustee shall pay out of the Trust all taxes, assessments, charges, fees, the Trustee's compensation, and other reasonable and necessary expenses incurred in the administration, management and protection of this Trust.

* * *

ARTICLE V
GENERAL ADMINISTRATION PROVISIONS

* * *

2.     This Trust Agreement is accepted by the Trustee in the State of Washington and the laws of the State of Washington shall govern the validity, construction and interpretation of the provisions of this instrument, the validity of the Trust created herein, and the administration of the accounting for such trusts and all other questions of law relative thereto.

Pls.' Mot., Ex. 4 ("Trust Agreement") 50-60.

On August 12, 1985, officials from the United States Department of Justice and MLSS executed owner and beneficiary designation forms with ELNY.  Compl. ¶ 3.4.  In September of

that year, the forms were amended to reflect a change in ownership from MLSS to the United States, exclusively.  Id. ¶ 3.5.  In 1991, the New York Department of Insurance placed ELNY into rehabilitation because its parent company had been placed in conservation.  Id. ¶ 4.1.  On April 23, 1991, the New York Superintendent of Insurance obtained a court order that gave him control of ELNY and froze surrenders.  Id.

On December 14, 2011, plaintiffs were advised in a letter from Merrill Lynch Life Agency ("MLLA") that due to the proposed plan to liquidate ELNY, MLLA would, as the owner of the ELNY annuities, make supplemental payments to plaintiffs so that they would continue to receive the amount specified in their structured settlement agreement.[2]  Pls.' Mot., Ex. 10.  Eight months later, on August 24, 2012, plaintiffs received another letter from MLLA stating that the representations made in its December 14, 2011 letter were in error:

> MLLA has recently reviewed records concerning your structured settlement and determined that the information upon which we relied when writing to you in December was inaccurate.  In fact, MLLA is not the owner of the ELNY annuity funding your structured settlement.  The indicated owner of the ELNY annuity purchased under your structured settlement is the United States. . . .
>
> Since MLLA is not the owner of the ELNY annuity funding your structured settlement, MLLA will not be making supplemental payments on your behalf if under the approved liquidation plan you receive a lower annuity payment than you were previously receiving from ELNY.

Pls.' Mot., Ex. 11.

In March 2012, the New York Rehabilitation Court approved a plan of liquidation for ELNY upon finding that its liabilities exceeded its assets by more than $1 billion.  Compl. ¶ 4.2.  Beginning in August 2013, the four annuity policies established as a result of plaintiffs' settlement agreement were restructured pursuant to the rehabilitation plan, resulting in lower monthly payments:

| | Beneficiary | PreLiquidation Monthly Payment | PostLiquidation Monthly Payment | PostLiquidation Monthly Payment as Percentage of PreLiquidation Monthly Payment |
|---|---|---|---|---|
| 1. | Karen L. Shaw | $4,166.00 | $3,354.47 | 80.5% |
| 2. | Raymond A. Shaw | $4,166.00 | $3,307.81 | 79.4% |

---

[2]  The parties make no distinction between MLLA and MLSS in this context.

| 3. | Richard Scott Shaw (Medical Trust) | $29,987.04 | $11,269.13 | 37.6% |
| 4. | Richard Scott Shaw (Guardianship) | $29,987.04 | $11,269.13 | 37.6% |

Id. ¶ 4.4.

In their complaint, plaintiffs allege that the United States breached the settlement agreement by (1) "failing to timely effectuate a qualified assignment of the four annuity policies pursuant to Section 130 of the Internal Revenue Code, which would have resulted in no loss to Plaintiffs"; (2) "failing to pay, or otherwise guarantee payment of, the reduction in the future monthly payments of the four annuities resulting from the liquidation of ELNY, as required pursuant to the terms of the Agreement and Medical Trust"; (3) "failing to pay, or otherwise guarantee payment of, the deferred monthly payments under the Medical Trust, ELNY policy N25952495A, which were to begin twenty five years from the date of the settlement (2011)"; and (4) "failing to pay, or otherwise guarantee payment of, the future lump sum payments under the Medical Trust, ELNY policy N25952495A." Id. ¶ 5.1.  Plaintiffs seek the present value of their damages, which amounts to $163,100 for Karen Shaw; $180,500 for Raymond Shaw; $28,328,088 for the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust; and $9,419,800 for the Richard Scott Shaw guardianship—for a total of $38,091,488.  Id. ¶ 6.1. Plaintiffs also seek attorney's fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.  Id. ¶ 7.1.

On May 19, 2015, plaintiffs filed a motion for partial summary judgment.  On August 19, 2015, defendant filed a cross-motion for partial summary judgment.  On January 21, 2016, following the parties' briefing of the issues raised in their respective cross-motions, the court stayed all proceedings in the instant action pending an appeal of the United States Court of Federal Claims' ("Court of Federal Claims") decision in Nutt v. United States, 121 Fed. Cl. 579 (2015).  Following the United States Court of Appeals for the Federal Circuit's ("Federal Circuit") decision in Nutt, which was issued on September 12, 2016, this court directed the parties to submit supplemental memoranda discussing the impact, if any, of that decision on the instant case.  Supplemental briefing concluded on December 9, 2016.

## II.  LEGAL STANDARDS

### A.  The Tucker Act

The ability of the Court of Federal Claims to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941).  A waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C.

§ 1491.  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages."  United States v. Testan, 424 U.S. 392, 398 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States."  Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).  "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary."  Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011).

In order to invoke Tucker Act jurisdiction based upon an express or implied-in-fact contract, a plaintiff must allege all of the requisite elements of a contract with the United States.  Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("[A] contract with the government requires proof of (1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract."); accord Kam-Almaz v. United States, 682 F.3d 1364, 1368 (Fed. Cir. 2012); Flexfab, L.L.C., v. United States, 424 F.3d 1254, 1258 (Fed. Cir. 2005); Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997).

## B.  Standing

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).  The standing inquiry involves both Article III "case or controversy" limitations on federal jurisdiction and prudential limitations on the exercise of federal jurisdiction.[3]  Id.  Plaintiff bears the burden of establishing its standing.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

## C.  Principles of Contract Interpretation

"To recover for breach of contract, a party must allege and establish:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); see also Trauma Serv. Grp., 104 F.3d at 1325 ("To prevail, [plaintiff] must allege facts showing both the formation of an express contract and its breach.").  The first step in that recovery is therefore to define the terms of the contract.

---

[3]  Congress created the Court of Federal Claims under Article I of the United States Constitution.  28 U.S.C. § 171(a).  Courts established under Article I are not bound by the "case or controversy" requirement of Article III.  Zevalkink v. Brown, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  However, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines in their cases for prudential reasons.  See id.; CW Gov't Travel, Inc. v. United States, 46 Fed. Cl. 554, 558 (2000).  These justiciability doctrines include, among others, ripeness, standing, mootness, and political questions.  Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005); see also Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) ("The Court of Federal Claims . . . applies the same standing requirements enforced by other federal courts created under Article III.").

"Contract interpretation is a question of law," Lucent Techs., Inc. v. Gateway, Inc., 543 F.3d 710, 717 (Fed. Cir. 2008); Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996), and is therefore "generally amenable to summary judgment," Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). See also NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Whether a contract provision is ambiguous is . . . a question of law," as is "[w]hether an ambiguity is patent or latent."). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Lynch v. United States, 292 U.S. 571, 579 (1934). As such, to resolve the current dispute, the court must identify and apply 'principles of general contract law.'" Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 10 (2007) (quoting Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002)).

The court applies "three primary rules of contract interpretation." Enron Fed. Sols., Inc. v. United States, 80 Fed. Cl. 382, 393 (2008). First, contract interpretation "begins with the language of the written agreement." NVT Techs., Inc., 370 F.3d at 1159; see also Enron Fed. Sols., Inc., 80 Fed. Cl. at 393 (stating that contract interpretation "start[s] with the plain meaning of the Contract's text"). A contract "is read in accordance with its express terms and the plain meaning thereof," C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); accord U.S. Sur. Co. v. United States, 83 Fed. Cl. 306, 311 (2008), and these terms are accorded "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning," Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The contract language "'must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances,'" Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 975 (Ct. Cl. 1965)), and "any subjective, unexpressed intent of one of the parties is ineffective," Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008).

Second, the court applies the "settled principle[ ] of contract interpretation," Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996), that a contract "be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts," NVT Techs., Inc., 370 F.3d at 1159. Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); see also United Int'l Investigative Serv. v. United States, 109 F.3d 734, 737 (Fed. Cir. 1997) (stating that the interpretation of a contract must "avoid[ ] conflict or surplusage of its provisions").

Third, "[t]he mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous." Enron Fed. Sols., Inc., 80 Fed. Cl. at 393; see also Metric Constructors, Inc., 169 F.3d at 751 ("To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations of a contract term.").

### 1. Unambiguous Contract Provisions

When a contract term is "clear and unambiguous on its face, the plain and ordinary meaning of the contract controls . . . ." Sterling, Winchester & Long, L.L.C., 83 Fed. Cl. at 183. As such, the court "cannot assign it another meaning, no matter how reasonable that other meaning might seem to be." Triax Pac., Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997). Thus, when the court encounters unambiguous contract terms, "extrinsic evidence is inadmissible to interpret them." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); see also Barseback Kraft AB v. United States, 121 F.3d 1475, 1479 (Fed. Cir. 1997) (stating that courts will give clear and unambiguous contract provisions "their plain and ordinary meaning and will not resort to parol evidence"). "To permit otherwise," the Federal Circuit cautioned, "would cast 'a long shadow of uncertainty over all transactions' and contracts." McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 569 (9th Cir. 1988)).

### 2. Ambiguous Contract Provisions

By contrast, a contract provision is ambiguous "only . . . if [it is] susceptible to more than one reasonable meaning," Barron Bancshares, Inc., 366 F.3d at 1375-76, and each meaning "is found to be consistent with the contract language," Enron Fed. Sols., Inc., 80 Fed. Cl. at 394. In other words, differing interpretations "must fall within a 'zone of reasonableness.'" Metric Constructors, Inc., 169 F.3d at 751. Where the contract language is ambiguous, disputed issues of fact may arise concerning the parties' intent. Perry-McCall Constr., Inc. v. United States, 46 Fed. Cl. 664, 672 (2000).

"Ambiguities in a government contract are normally resolved against the drafter." Triax Pac., Inc., 130 F.3d at 1474. As the Federal Circuit stated in Turner Construction Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004), "[w]hen a dispute arises as to the interpretation of a contract and the [private contracting party's] interpretation of the contract is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." See also United States v. Seckinger, 397 U.S. 203, 216, reh'g denied, 397 U.S. 1031 (1970) ("[A]s between two reasonable and practical constructions of an ambiguous contractual provision . . . the provision should be construed less favorably to that party which selected the contractual language."), quoted in Stathis, 120 Fed. Cl. at 563. However, there is an exception to this rule, depending upon the type of ambiguity contained in the contract. Triax Pac., Inc., 130 F.3d at 1474. "In order to decide how to apply the doctrine of contra proferentem, after a court finds contract terms to be ambiguous and 'susceptible to more than one reasonable interpretation,' the court must first determine whether the ambiguity is latent or patent." Burchick Constr. Co. v. United States, 83 Fed. Cl. 12, 19 (2008) (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1341 (Fed. Cir. 2004)); accord Metric Constructors, Inc., 169 F.3d at 751 ("If [the] court interprets the contract and detects an ambiguity, it next determines whether that ambiguity is patent.").

### a. Patent Ambiguities

A patent ambiguity is one that is "obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start." H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974). It is "an obvious omission, inconsistency, or discrepancy of significance," Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504 (Ct. Cl. 1963), or "an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap," WPC Enters., Inc. v. United States, 323 F.2d 874, 876 (Ct. Cl. 1963). A patent ambiguity "exists where there is a facial inconsistency between provisions or terms within the contract." Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 711 (2007). Thus, a patent ambiguity "should be, to the reasonable [contracting party], apparent on the face of the contract . . . ." Id.; accord P.R. Burke Corp. v. United States, 277 F.3d 1346, 1355 (Fed. Cir. 2002) (indicating that a patent ambiguity appears "on the face of the contract").

The United States Court of Claims, the predecessor to the Federal Circuit,[4] described the inquiry into whether an ambiguity is patent as "not a simple yes-no proposition[,] but [one] involv[ing] placing the contractual language at a point along a spectrum: Is it so glaring as to raise a duty to inquire?" Newsom v. United States, 676 F.2d 647, 650 (Ct. Cl. 1982); see also Jaynes v. United States, 75 Fed. Cl. 218, 235 (2007) ("What constitutes a patent ambiguity must be determined 'on an ad hoc basis by looking to what a reasonable man would find to be patent and glaring.'" (quoting L. Rosenman Corp. v. United States, 390 F.2d 711, 713 (Ct. Cl. 1968))). "The doctrine of patent ambiguity is an exception to the general rule of contra proferentem[,] which construes an ambiguity against the drafter . . . ." Metric Constructors, Inc., 169 F.3d at 751. Thus, a patent ambiguity "'would place the reasonable [private contracting party] on notice and prompt [that party] to rectify the inconsistency by inquiring of the appropriate parties.'" Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 630 (2002) (quoting Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed. Cl. 5, 11 (1999)); see also Fortec Constructors v. United States, 760 F.2d 1288, 1291 (Fed. Cir. 1985) (stating that the existence of a patent ambiguity "raises the duty of inquiry, regardless of the reasonableness of the [private contracting party's] interpretation").

### b. Latent Ambiguities

By contrast, a latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'" Diggins Equip. Corp. v. United States, 17 Cl. Ct. 358, 360 (1989) (quoting Avedon Corp. v. United States, 15 Cl. Ct. 771, 777 (1988)). A latent ambiguity "arises only once the contract is applied," Travelers Cas. & Sur. Co. of Am., 75 Fed. Cl. at 711, and "generally becomes evident, when, 'considered in light of the objective circumstances, two conflicting interpretations appear reasonable,'" Input/Output Tech., Inc., 44 Fed. Cl. at 72 n.10 (quoting Cray Research, Inc. v.

---

[4] South Corp. v. United States, 690 F.2d 1368, 1369 (Fed. Cir. 1982) (en banc) ("We hold that the holdings of our predecessor courts, the United States Court of Claims and the United States Court of Customs and Patent Appeals, announced by those courts before the close of business September 30, 1982, shall be binding as precedent in this court.).

  
United States, 41 Fed. Cl. 427, 435 (1998)).  "[T]he general rule of <u>contra proferentem</u> controls"
with regard to latent ambiguities.  <u>Burchick Constr. Co.</u>, 83 Fed. Cl. at 20.  Thus, the doctrine of
contra proferentem "places the risk of latent ambiguity, lack of clarity, or absence of proper
warning on the drafting party."  <u>Id.</u>  This doctrine, however, is applied by courts

> only when other approaches to contract interpretation have failed.
> Accordingly, our predecessor court held that 'if an ambiguity
> cannot be cleared up by reading the contract as a whole or looking
> to the circumstances attending the transaction and the conduct of
> the parties, the ambiguity should be resolved against the party who
> drafted the contract.'

<u>Gardiner, Kamya & Assocs., P.C.</u>, 467 F.3d at 1352 (quoting <u>Chris Berg, Inc. v. United States</u>,
455 F.2d 1037, 1044 (Ct. Cl. 1972)).

　　　The determination that an ambiguity is latent, however, does not necessarily result in the
court adopting the plaintiff's interpretation.  <u>Cmty. Heating & Plumbing v. Kelso</u>, 987 F.2d
1575, 1579 (Fed. Cir. 1993).  Rather, the court adopts the plaintiff's interpretation of a latent
ambiguity only if it is reasonable.  <u>Id.</u>  Thus, "[i]f the ambiguity . . . is latent, and plaintiff's
interpretation is reasonable, plaintiff will prevail over an equally reasonable interpretation by
defendant."  <u>Diggins Equip. Corp.</u>, 17 Cl. Ct. at 360; <u>accord</u> <u>Alliant Techsys., Inc. v. United
States</u>, 74 Fed. Cl. 566, 577 (2007) ("The Court will adopt a contractor's reasonable
interpretation of a latent ambiguity under the <u>contra proferentem</u> rule—construing an ambiguity
against the drafter.  . . .  If the contractor's interpretation of such a contract provision is
determined to be reasonable, . . . the contractor will prevail against the author of the contract."
(internal citations omitted)).

### 3.  Absence of Contract Provisions

　　　Of course, if a contract is a silent with respect to a particular issue, it may not be that the
contract is ambiguous as to that issue.  For example, in <u>Gardiner, Kamya & Assocs., P.C. v.
Jackson</u>, 467 F.3d 1348, 1353-54 (Fed. Cir. 2006), the Federal Circuit found that, when
considered as a whole, the language of the contract at issue was not ambiguous.  Specifically, the
court concluded that "[t]he phrase '[s]uch prices shall remain in effect pending results of the
audit and subsequent negotiations of the unit prices' does not in any way state or suggest a
retroactive pricing arrangement, and we may not 'convert an agreement's utter silence on an
issue into contractual ambiguity.'"  <u>Id.</u> (quoting <u>New Jersey v. New York</u>, 523 U.S. 767, 783 n.6
(1998)).  Similarly, in <u>Holland v. United States</u>, 74 Fed. Cl. 225, 263 (2006), the court held:
"The contract's silence regarding the treatment of preferred stock is not an ambiguity; rather, it
reflects absence of any promise, especially in light of the fact that the contract documents
specifically enumerated the other regulatory capital promises."

### D.  RCFC 56

　　　Summary judgment is appropriate when there is no genuine issue of material fact and the
moving party is entitled to a judgment as a matter of law.  RCFC 56(a); <u>Celotex Corp. v. Catrett</u>,

477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions.  See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009).

### III. DISCUSSION

The parties in the instant action agree that the settlement agreement at issue constitutes a valid contract between plaintiffs and the United States.  However, they have not reached a similar consensus regarding the remaining elements of plaintiffs' breach claim.

## A. Summary of the Parties' Arguments

## 1. The Parties' Initial Arguments

In their motion for partial summary judgment, plaintiffs seek a ruling in their favor on the issue of liability. According to plaintiffs, the language of the settlement agreement unambiguously provides that the United States is "obligated to see that plaintiffs received the future monthly and periodic payments as set forth specifically in the Settlement Agreement." Pls.' Mot. 23. Plaintiffs claim that Massie v. United States, 166 F.3d 1184 (Fed. Cir. 1999), a decision by the Federal Circuit, controls because in both cases: (1) plaintiffs sued the United States for breach of a settlement agreement intended to compensate them for injuries caused by medical malpractice at a military hospital; (2) the language used in both settlement agreements was "uncontrovertibly very similar," such that in Massie, "the settlement agreement specified that the annuity 'will result in distributions on behalf of the United States' and that the disbursements from the annuities 'shall be paid,'" whereas in the instant action, the settlement agreement "specifie[d] the purchase of annuities 'which will provide' certain future periodic payments, the purchase of annuities 'that will provide' periodic or other payments, the annuities purchased by the United States of America 'shall make the following payments,' and the annuity for the medical care trust 'will provide' future lump sum payments"; (3) both settlement agreements specified that the United States would be the "sole owner of the annuities"; (4) both settlement agreements specified that the United States "would purchase the annuities through an intermediary settlement company"; (5) both settlement agreements specified a "maximum dollar cost for the purchase of the annuities"; (6) both settlement agreements were between "the plaintiffs (as annuity beneficiaries) and the United States of America"; (7) both settlement agreements specified that the United States would purchase the annuities as soon as possible after the execution of the agreements; (8) both settlement agreements specified that "an irrevocable reversionary medical care trust [would be created] for the injured plaintiff"; and (9) both settlement agreements specified that "some payments [would be] guaranteed for a period of time." Id. at 22-23. In addition, plaintiffs note that neither the settlement agreement reached in Massie nor the one on the instant action "placed any restrictions on the parties' rights to enforce its terms." Id. at 23.

Although plaintiffs argue that the language of the settlement agreement is unambiguous, they also argue in the alternative that even if the court were to conclude that the language is ambiguous, pursuant to Massie and Stathis v. United States, 120 Fed. Cl. 552 (2015), a case in which the Court of Federal Claims explicitly followed the Federal Circuit's ruling in Massie, the court should nevertheless rule in plaintiffs' favor. Id. at 25. First, plaintiffs contend that because the United States drafted the settlement agreement, any ambiguity in its language must be construed against the United States. Id. Thus, plaintiffs argue that their interpretation of the settlement agreement—their belief "that they would receive all future payments provided for in the annuities; and if not, the government would make good on the obligation as guarantor"—is reasonable. Id. at 25-26. In support of their argument, plaintiffs contend that the settlement agreement contains mandatory payment language and that the parties could have "explicitly shifted the risk of loss to a third party, such as MLSS or the annuity company, in this case ELNY," but chose not to. Id. at 26. Plaintiffs also emphasize "[t]he fact that the government was explicitly to remain as owner of the annuity policies, and the fact that the government

drafted the medical care trust, was named Trustor, and retained powers over the administration of that trust." Id.

In addition, plaintiffs aver that the United States "breached its contract with plaintiffs at the very outset of the settlement." Id. at 27. According to plaintiffs, although the express language of the settlement agreement provided that the "annuities will be owned solely and exclusively by the United States, MLSS actually purchased the annuities from ELNY with its own money in January 1985 because the United States was unable to do so at that time. Id. Thus, plaintiffs contend that even though ownership of the annuities was ultimately assigned to the United States on September 9, 1985, the United States breached the settlement agreement by failing "to fund the purchase of the annuities within 60 days of the settlement, as required by [Internal Revenue Code] § 130 as a condition precedent for the Qualified Assignment that would have made MLSS liable to plaintiffs for the shortfall in future payments arising from the liquidation of ELNY." Id.

Lastly, plaintiffs argue, referencing a pamphlet produced by the United States Department of the Army, that "[t]he government's FTCA settlement practices encourages the payment of meritorious claims and the use of structured settlements in cases such as the present case, without any discussion of avoiding responsibility for future periodic payments." Id. at 27-28. Plaintiffs therefore conclude: "In light of the foregoing mission and intent of the government in fairly settling cases and ensuring that injured claimants will receive their future payments, it seems implausible that the government can claim to have no future obligation to see that those policies and the lost payments are continued based on an argument that once they purchased the annuities they were relieved from any further responsibilities." Id. at 28.

In its opposition to plaintiffs' motion and cross-motion for partial summary judgment, the United States contends that "plaintiffs agreed to compromise and release their FTCA claims in exchange for the United States' payment of cash sums to purchase the annuities in question, not in exchange for a promise or guarantee by the United States that each annuity payment would be made in full." Def.'s Resp. & Cross-Mot. 2. According to the United States, it "lacks the authority to make or guarantee future periodic payments in settlements under the FTCA, and the actual authority conferred to settle this action authorized an amount sufficient only to purchase the annuities, not to make or guarantee payments to be made by the annuities." Id.

The United States identifies two issues for the court's resolution: (1) "Whether Plaintiffs have standing to bring a claim for annuity shortfalls owed to a Trustee of a Reversionary Medical Care Trust"; and (2) "Whether the plain language of the FTCA settlement agreement, which provided that plaintiffs agreed to accept the United States' payment of $4.8 million for certain lump sums and to purchase the annuities at issue in exchange for a complete release and satisfaction of their FTCA claims, additionally required the United States to make or guarantee future annuity payments to the plaintiffs." Id.

With respect to plaintiffs' standing, the United States argues that while plaintiffs claim that the United States breached the settlement agreement with respect to annuity payments for (1) Raymond Shaw, (2) Karen Shaw, (3) Richard Scott Shaw, through his guardians ad litem or other appointed representative(s), and (4) the trustee of the Richard Scott Shaw Irrevocable

Reversionary Medical Care Trust, plaintiffs lack standing to assert claims on behalf of the trustee of their son's medical care trust. Id. at 10. According to the United States, because the settlement agreement provides that all payments are owed to the trustee, and because the trustee alone has the power to manage the trust, which includes the power to bring suit on behalf of the trust, plaintiffs lack standing in this regard. Id. In addition, the United States notes that to date there has been no indication that the trustee is unable to make payments from the trust in accordance with the trust agreement, thereby rendering plaintiffs' claim "an inherently speculative exercise." Id. at 11. The United States contends: "There is no present, concrete, particularized, and imminent injury to the plaintiffs from annuity shortfalls owed to the Trust. Plaintiffs therefore lack standing to pursue monetary damages based on these shortfalls, which are neither owed to them directly, nor have caused a particularized injury to them." Id. at 11-12.

With respect to the merits—whether the settlement agreement obliges the United States to guarantee all future annuity payments, the United States advances eight arguments in support of its position that it does not: (1) requiring the United States to guarantee all future annuity payments would render the contract unenforceable in that it would place unlawful obligations on the United States because (a) the Deputy Attorney General—the United States Department of Justice attorney who approved the settlement agreement—authorized "an amount not to exceed $4,800,000,"[5] and (b) the FTCA's limited waiver of sovereign immunity only permits lump sum payments, id. at 14-30; (2) the terms of the settlement agreement, when given their plain meaning, only obliged the United States to make lump sum payments and purchase annuities, id. at 30-37; (3) the Federal Circuit's decision in Massie—wherein the court held that the United States had agreed to guarantee future annuity payments—was distinguishable from Stathis and the instant action because the contract in Massie was made pursuant to the Military Claims Act ("MCA"), not the FTCA, id. at 37-40; (4) even if the contract in the instant case were to be interpreted as requiring the United States to make future payments, that obligation was met and discharged through the doctrine of accord and satisfaction in that plaintiffs' acceptance of the United States' purchase of annuities effected a satisfaction of that obligation, id. at 40-42; (5) plaintiffs' reliance on the doctrine of contra proferentem is misplaced because the contract was not drafted solely by the United States—it was the result of a negotiated settlement that involved both parties, id. at 42-44; (6) plaintiffs' belief that the United States had agreed to guarantee all future annuity payments because no annuity company was named in the contract and because the contract did not specify that the annuity company had to be of a certain quality or grade is irrelevant to the court's determination of the terms of the settlement agreement, id. at 44-45; (7) the United States' ownership of the annuities and establishment of the medical care trust is irrelevant to the court's analysis of the terms of the settlement agreement in that (a) payments are made by the annuity issuer, not the annuity owner, and (b) the trustee, not the United States, is responsible for administering the trust and making payments to Richard Scott Shaw, the trust's beneficiary, id. at 45-47; and (8) the parties never contemplated a qualified assignment of the ownership of the annuities from MLSS to the United States because the settlement agreement provided that the United States would be the exclusive owner of the annuities, id. at 47-49.

---

[5] The United States notes that in 1985, the year the settlement agreement was approved, only the Deputy Attorney General possessed the authority to approve a settlement amount greater than $750,000. Def.'s Resp. & Cross-Mot. 16.

In their reply, plaintiffs argue first that they have standing to assert a claim on behalf of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust. Pls.' Reply & Resp. 2-6. According to plaintiffs, the trust agreement does not, as the United States contends, expressly state that the trustee has "the right to enforce any claim belonging to the Trust." Id. at 2. According to plaintiffs, the language of the trust agreement that grants the trustee the authority to "exercise exclusive management and control of the trust" refers only to the trustee's right to manage and invest the annuity's funds. Id. at 2-3 (quoting Trust Agreement 57). In support of their argument, plaintiffs reference a letter they received from the trustee, Wells Fargo Bank, wherein the bank declined to join the instant lawsuit. Id. at 3. In plaintiffs' view, the trustee's scope of authority is limited "to provid[ing] reasonable and necessary medical, institutional and related care and services to the Beneficiary, Richard Scott Shaw, during his lifetime." Id. Plaintiffs also claim that the trust agreement was made between the United States, as trustor, and Wells Fargo Bank, as trustee, and therefore does not govern or limit any rights plaintiffs may have vis-à-vis the trust. Id. According to plaintiffs, their right to sue arises, pursuant to the terms of the trust agreement, under the laws of the state of Washington. Id. at 3-4. Finally, in response to the United States' suggestion that any claim plaintiffs may have on behalf of the trust is not ripe, plaintiffs contend that because they agreed—in response to a request from the trustee—"to share the guardianship account monies managed by the Bank of America, as guardian of the estate of Richard Scott Shaw, to meet his potential future needs, in order to have the impact on reducing the current medical budget," plaintiffs' claim is ripe for adjudication. Id. at 5.

Plaintiffs argue further that (1) the FTCA does not prohibit the United States from satisfying a future periodic payment obligation by reducing the amount to its present value, id. at 13-15; (2) the principle of accord and satisfaction does not apply to the instant dispute because, in plaintiffs' view, the parties have not reached an agreement on the issue of "whether the Defendant is a guarantor of the future periodic payments," id. at 15-17; (3) the doctrine of contra proferentum is appropriate in this case because the contract contain a latent ambiguity,[6] id. at 17-18; and (4) the United States would not have attempted to make a qualified assignment of the annuities had it not "believed it was ultimately responsible for the future periodic payments," id. at 18.

In its reply, the United States reiterates its primary argument—that the settlement agreement unambiguously provides that the United States' obligation under the contract was satisfied by the payment of certain lump sums and the purchase of four annuities. Def.'s Reply 2-3. In the alternative, the United States again contends that even if the court were to conclude that the terms of the contract are ambiguous, to interpret the contract as requiring the United States to guarantee future monthly annuity payments would be to "render the settlement agreement void and unenforceable" because the FTCA's limited waiver of sovereign immunity does not allow for such a promise on the part of the United States. Id. at 4-7. More generally, the United States contends that the only way plaintiffs can prevail is if the government official who negotiated the settlement agreement had the authority to bind the United States to pay an

---

[6] Plaintiffs mistakenly refer to the relevant doctrine as the doctrine of "contra preferendum," while defendant and the court refer to the same doctrine as "contra proferentem." See Contra Proferentem, Black's Law Dictionary (9th ed. 1999).

amount greater than $4,800,000—the figure identified in the contract as the "total, final cost." Id. at 5-6 (quoting Settlement Agreement 68).

Next, the United States reiterates its previous arguments with respect to (1) its interpretation of the Massie and Stathis cases, id. at 7-10; (2) plaintiffs' standing to bring suit on behalf of the trustee of the medical trust, id. at 10-13; (3) accord and satisfaction, id. at 14-16; (4) contra proferentem, id. at 16-18; and (5) qualified assignment, id. at 18-19.

Lastly, the United States argues that plaintiffs "have confused the FTCA's limited waiver of immunity, which prohibits the government from ever entering into a settlement agreement imposing continuing, future, and ongoing payment obligations, with the remedy they might hypothetically obtain if the United States breached a contract that actually contained a promise to make payments in future installments." Id. at 19-20. In addition, the United States notes that only the issue of liability is before the court, not damages. Id. at 20.

## 2. The Parties' Arguments Following the Federal Circuit's Ruling in Nutt

As noted above, following the parties' briefing of the issues raised in their respective cross-motions for partial summary judgment, the court stayed all proceedings in the instant action pending an appeal of the Court of Federal Claims' decision in Nutt v. United States, 121 Fed. Cl. 579 (2015). In that case, Cynthia Nutt and her son, James Nutt, Jr., sued the United States for breach of the settlement agreement entered into by the parties in 1985 pursuant to the FTCA.[7] Id. at 581. The settlement agreement provided that the United States "agrees to purchase annuities which will pay" certain amounts to the Nutts. Id. at 581-82. Second, it provided that on the "anniversaries of the purchase of the annuity," certain lump sum payments would be made to plaintiffs. Id. at 582. The agreement then stated that "[t]he payments by the United States set forth above shall operate as full and complete discharge of all payments to be made to and of all claims which might be asserted . . . ." Id.

In 1985, pursuant to the terms of the settlement agreement, the United States purchased a structured annuity from ELNY, the same company at issue in the instant action. Id. at 583. And, as also occurred in the instant action, after ELNY was placed in receivership in 1991 and its assets liquidated in 2011, Cynthia Nutt was informed that her payments would be reduced. Id. Thereafter, she filed suit against the United States, arguing that the settlement agreement provided that the United States would guarantee the annuity's future payments. Id. at 585. The United States argued that it made no such guarantee. Id. at 586-88.

Ultimately, the Court of Federal Claims granted summary judgment in favor of the United States. Id. Specifically, the court held the following: (1) the Federal Circuit's decision in Massie, wherein the court held that the United States was obligated to guarantee future periodic annuity payments resulting from a settlement agreement, was not controlling because that case was brought pursuant to the MCA rather than the FTCA; (2) viewing the contract as a whole, the United States only agreed to purchase, not guarantee, the annuities; (3) the inclusion

---

[7] Cynthia Nutt's husband, "James Nutt, Sr.[,] was killed when his vehicle was struck by a United States Army truck driven by a drunk Army employee." Nutt, 121 Fed. Cl. at 581.

in the settlement agreement of a provision stating that the United States would help plaintiffs in their suit against the insurance company if the insurance company defaulted would not make sense if the United States was agreeing at the same time to be a guarantor of future annuity payments; and 4) the FTCA only provides for a limited waiver of the United States' sovereign immunity, one that did not include a promise by the United States to guarantee future annuity payments.  Id. at 588-91.

On appeal, the Federal Circuit affirmed the trial court's decision.  Nutt v. United States, 837 F.3d 1292 (Fed. Cir. 2016).  It held that pursuant to the terms of the settlement agreement, the United States agreed to (1) purchase annuities, which would in turn make payments to plaintiffs and (2) make lump sum payments to Cynthia Nutt and the plaintiffs' attorneys.  Id. at 1294.  It also held that although parties may, under the FTCA, "agree to structure a damages plan to include future installment payments," the language of the settlement agreement unambiguously provided that the United States was only obligated to purchase annuities, not to guarantee that future payments would be made.  Id. at 1295-98.  Finally, the court distinguished Massie on grounds different from those given by the trial court.  According to the Federal Circuit, Massie was not controlling because in that case the settlement agreement expressly guaranteed the lump sum and annuity payments while in Nutt, the settlement agreement expressly provided that the plaintiffs would retain standing to sue the insurance company (and that the United States would assist in such prosecution) in the event that the contract was breached.  Id. at 1299.

Following the Federal Circuit's decision in Nutt, this court directed the parties to submit supplemental memoranda discussing the impact, if any, of that decision on the instant case.  Both parties contend in their memoranda that the Federal Circuit's decision in Nutt supports their respective positions.

In their first supplemental brief, plaintiffs argue that three distinct points made by the Federal Circuit are critical to this court's analysis.  Pls.' Mem. Re: Nutt 2-6.  First, plaintiffs note that the Federal Circuit unequivocally rejected the United States' contention that under no circumstances is the United States free to agree, in the settlement of an FTCA suit, to make future period payments.  Id. at 2.  According to plaintiffs, this is evidenced by the Federal Circuit's statement that, as recognized by the United States Court of Appeals for the First Circuit ("First Circuit") in Reilly v. United States, 863 F.2d 149 (1st Cir. 1988), and the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") in Vanhoy v. United States, 514 F.3d 447 (5th Cir. 2008), where the parties "expressly agree to such payments," such agreements must be honored.  Pls.' Mem. Re: Nutt 2 (internal quotation marks omitted).  Second, plaintiffs note that the Federal Circuit rejected the United States' claim that a settlement agreement made pursuant to the MCA, as in Massie, was to be interpreted differently from one made pursuant to the FTCA.  Id. at 3.  In Nutt, plaintiffs observe, the Federal Circuit held that the court must focus on the language of the agreement itself, rather than the statute authorizing the settlement.  Id.  Finally, plaintiffs argue that upon comparing the language used by the parties in the instant action with that used in the settlement agreements executed by the parties in Massie, Nutt, and Stathis, the court will conclude that Massie controls and that the parties currently before it did in fact contract for the United States to act as a guarantor of all future periodic payments to plaintiffs.  Id. at 3-6.

In their responsive supplemental brief, plaintiffs note that their settlement agreement contained phrasing similar to that used in <u>Massie</u>.  Pls.' Suppl. Mem. Re: <u>Nutt</u> 3-4.  According to plaintiffs, the <u>Massie</u> contract's statements "that the annuity 'will result in distributions' and that payments were 'guaranteed' and 'shall be paid,'" <u>id.</u> at 3, are comparable to their contract's statements that (1) the "[p]urchase of annuities 'which will to (sic) provide'"; (2) MLSS "'will provide' the periodic or other payments"; (3) the United States "'will make' the following payments"; and (4) "[t]he annuities purchased by the United States of America 'shall make' the following payments."  <u>Id.</u> at 3-4.

Furthermore, plaintiffs note that while the settlement agreements in both <u>Massie</u> and this case provided that the annuities were to be purchased from LMW Settlements, Inc. in amounts not to exceed specified dollar values, no such provision existed in the <u>Nutt</u> settlement agreement. <u>Id.</u> at 4.

Finally, plaintiffs point to the fact that their settlement agreement made "no mention of the quality of the annuities to be purchased" as further proof that the United States intended to guarantee plaintiffs' future monthly annuity payments:  "The government has repeatedly argued, at the Court of Appeals for the Federal Circuit in <u>Massie</u>, . . . , at the Court of Federal Claims in <u>Massie</u>, . . . , and the Court of Appeals for the Federal Circuit in <u>Nutt</u>, . . . , that if the government truly intended to guarantee the payments there would be no need to reference the quality of the annuities in the settlement agreements."  <u>Id.</u>

In its initial response to the court's order for supplemental briefing, the United States first acknowledges that two of its previous arguments—that the United States could not agree to guarantee future annuity payments and that the authority of the United States to enter into settlement agreements pursuant to the FTCA was necessarily different from its authority to enter into settlement agreements pursuant to the MCA—were now moot given the Federal Circuit's decision in <u>Nutt</u>.  Def.'s Mem. Re: <u>Nutt</u> 5.  Next, the United States argues, as do plaintiffs, that the key to identifying the terms of any settlement agreement is to conduct a "plain language analysis" of the contract.  <u>Id.</u> at 5-9.  Unlike plaintiffs, however, the United States concludes that such analysis reveals that the United States, although capable of agreeing to make or guarantee future monthly or periodic payments, did not do so in the instant case.  <u>Id.</u>

Whereas plaintiffs argue that the Federal Circuit's reasoning in <u>Massie</u> controls because the language of the <u>Massie</u> settlement agreement is similar to the language of their settlement agreement, the United States advances the same argument with respect to <u>Nutt</u>.  <u>Id.</u>  First, according to the United States, both the settlement agreement in <u>Nutt</u> and the settlement agreement in this case place the burden of payment on the company from which the annuities were purchased:  "Just as the Nutt agreement provided that the United States 'agrees to purchase annuities <u>which will pay</u> [certain periodic amounts], . . . the Shaw agreement provided that the United States was responsible for 'the purchase of annuities <u>which will to provide</u> [sic] certain future periodic payments."  <u>Id.</u> at 5-6 (alteration in original).  Similarly, the United States notes that the settlement agreement in this case "elsewhere provided that the United States would provide money to a structured settlement broker 'for the purchase of annuities that would provide the periodic or other payments.'"  <u>Id.</u> at 6.

Second, the United States contends that because both settlement agreements contain a passive reference to a schedule of future payments that "shall be paid," neither contract should be viewed as requiring the United States to act as either the payor or guarantor of those sums.  Id. In further support of its argument, the United States notes that the settlement agreement in this case explicitly makes the annuities responsible for such payments.  Id.

Third, the United States argues that the language of both settlement agreements was clear when the intent was to impose an obligation upon the United States; the agreement in this case provided that "[t]he Defendant, United States of America, will make the following [lump-sum payments]" and the Nutt agreement provided that the "United States of America further agrees to pay [lump-sum payments]."  Id.

Fourth, the United States claims that the language of the settlement agreement in this case was more explicit than the language in Nutt when it came to identifying the United States' consideration.  Id. at 6-7.  According to the United States, because the Federal Circuit in Nutt interpreted the phrase "payments by the United States set forth above shall operate as a full and complete discharge of [obligations]" as a reference to lump sum payments and purchase of annuities, there can be no doubt as to the United States' consideration in this case.  Id. at 7 (alteration in original).  The United States contends that the settlement agreement in this case could not have included a guarantee of future monthly annuity payments given the following language:  "In exchange for payment of the sums set forth in paragraph 5[, which stated that $4.8 million would be divided among lump-sum payments to plaintiffs and their attorneys, and would be used to purchase annuities,] . . . plaintiffs should file . . . a dismissal of the action . . . ."  Id.

Lastly, the United States dismisses the importance, in plaintiffs' settlement agreement, of the use of the word "guarantee" with respect to the monthly payments owed Richard Scott Shaw's parents.  Id. at 7-9.  According to the United States, "responsibility for all future sums, including these future sums, plainly rested with the annuity company, not the United States."  Id. at 7.  The United States contends that "it would be irrational to interpret these guarantees as the responsibility of the United States" given the fact that the settlement agreement expressly limited the total cost of settlement to $4.8 million.  Id. at 8.

In its responsive supplemental brief, the United States claims that plaintiffs' reliance on certain mandatory language in their settlement agreement—"will provide," "will be purchased," "will establish," and "will make payment"—as proof of the United States' promise to guarantee future monthly annuity payments is misplaced because in each of these instances, the obligation is being imposed on the annuity company.  Def.'s Suppl. Mem. Re: Nutt 2-3.  By comparison, avers the United States, any obligation it assumes is clearly articulated.  Id. at 3.

In addition, the United States counters plaintiffs' argument that the use of the word "guarantee" twice in their settlement agreement cannot be understood as a reference to the United States because "the United States is not identified in either paragraph as payor or guarantor."  Id. at 3-4.  Alternatively, it contends that if the contract were to be read as plaintiffs suggest, it would have no bearing on plaintiffs' breach-of-contract claim because the provision only provided for a guarantee of payments due from 1985 to 2005 and because the parties do not dispute that these payments were timely and made in full.  Id. at 4.

Finally, the United States dismisses plaintiffs' argument regarding the significance of the absence of language in their settlement agreement guaranteeing that the chosen annuity company would be highly rated and that plaintiffs would retain standing to bring suit in the case of a default.  Id. at 4.  According to the United States, "to infer a [contractually based] guarantee based on an alleged lack of language inconsistent with a guarantee . . . would constitute a serious mistake of law, and plain error."  Id. at 5.

## B. Analysis

As explained above, plaintiffs claim that the United States breached the settlement agreement in three distinct ways:  (1) by failing to timely effectuate a qualified assignment of the four annuity policies, in violation of the Internal Revenue Code; (2) by failing to pay or guarantee future monthly payments from the four annuities following the liquidation of ELNY; and (3) by failing to pay or guarantee "deferred monthly payments" or "future lump sum payments" under the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust.  Compl. ¶ 5.1.

### 1. The Settlement Agreement Did Not Provide for an Assignment of the Annuities From the United States to MLSS

Plaintiffs argue that the United States' qualified assignment of the annuities to MLSS violated the Internal Revenue Code.  Pls.' Mot. 27.  According to plaintiffs, had the assignment been properly perfected, plaintiffs would have been able to hold MLSS liable for any shortfalls in payments.  Id.  Conversely, the United States argues that the settlement agreement provided that the annuities were to be "owned solely and exclusively by the United States of America."  Def.'s Resp. & Cross-Mot. 48.  According to the United States, "[n]owhere in the settlement agreement did the parties intend or otherwise agree that a qualified assignment was part of the settlement."  Id.  The United States further contends that although MLSS erred in initially identifying itself as the owner of the annuities, it corrected its mistake when it transferred ownership of the annuities to the United States, as mandated by the terms of the settlement agreement.  Id. at 49.  Lastly, the United States refers to a 1985 letter from MLSS indicating that the reason MLSS "prefunded" the annuities was to avoid premium cost increases and the reason MLSS initially took ownership of the annuities was because of the United States' inability to provide funding.  Id.

The settlement agreement is silent with respect to whether the annuities were to be assigned to MLSS.  Thus, however valid the MLSS's explanation may be, it is ultimately irrelevant to the court's conclusion that the plain language of the settlement agreement (1) provided that the annuities were to be owned by the United States, and (2) did not provide for an assignment, at any time, of the annuities from the United States to MLSS.  In other words, as in Holland, 74 Fed. Cl. at 263, the settlement agreement's silence as to assignment reflects not an ambiguity but the "absence of any promise."  Thus, the court may not consider extrinsic or parol evidence.  See Barron Bancshares, Inc., 366 F.3d at 1375.

**2.  The Federal Circuit's Decision in <u>Nutt</u> Made Clear That the United States May Obligate Itself, Through an FTCA Settlement Agreement, to Guarantee Future Annuity Payments, and the United States Made a Time-Limited Promise to Do so in the Instant Case**

As discussed above, in its recent decision in <u>Nutt</u>, the Federal Circuit held that the federal government may enter into a structured settlement agreement that provides for future installment payments.  837 F.3d at 1295-99.  Significantly, the court explained that its holding was in accordance with the positions taken by the First Circuit in <u>Reilly</u>, 863 F.2d at 170 ("When a tortfeasor loses at trial, then—absent a statute or the parties' contrary agreement, . . .—it must pay the judgment in one fell swoop."), and the Fifth Circuit in <u>Vanhoy</u>, 514 F.3d at 454 & n.34 (recognizing that the parties in interest could agree to a periodic damage award), and in contrast to the position taken by the United States in that case.  <u>Nutt</u>, 837 F.3d at 1295-99.  To better explain its holding, the Federal Circuit reproduced the relevant portions of the settlement agreement in its opinion.  Because the Federal Circuit's reasoning controls the court's analysis here, the language of the <u>Nutt</u> settlement agreement is reproduced below.  The <u>Nutt</u> agreement provided, in pertinent part:

> [Paragraph 3] As soon as practicable after approval of this settlement, the United States of America agrees to purchase annuities which will pay the following amounts:

> I.

> [Paragraph 4] 1. a. [$60,000 per year] to Cynthia G. Nutt, her estate or designated beneficiary for as long as [she] shall live or for thirty (30) years certain, whichever is later.

> [Paragraph 5] b. On each of the following anniversaries of the purchase of the annuity, the following specified lump sum payments shall be paid to Cynthia G. Nutt, her estate or designated beneficiary:

> [listing anniversaries and amounts]

> [Paragraph 6] 2. On each of the following anniversaries of the purchase of the annuity, the following specified lump sum payments shall be paid to James N. Nutt, Jr., his guardian, his estate or designated beneficiary.

> [listing anniversaries and amounts]

> * * *

II.

[Paragraph 10] As soon as practicable after approval of this agreement, the United States of America further agrees to pay [$240,000.00] to Cynthia G. Nutt . . . and a sum equal to twenty percent of the total cost to the United States of the entire settlement distributed to the [Plaintiffs' attorneys].

[Paragraph 11] The payments by the United States set forth above shall operate as full and complete discharge of all payments to be made to and of all claims which might be asserted on behalf of [Plaintiffs,] . . . provided, however, that if the insurance company hereinafter referred to defaults in the performance of its obligations under the annuity agreement with the United States, [Plaintiffs] . . . shall have standing to sue the said insurance company for breach of contract.  In such event, the United States shall assist [Plaintiffs], their heirs or personal representatives, in the prosecution of said suit to the extent permitted by applicable laws and regulations.

[Paragraph 12] The United States represents to [Plaintiffs] that the insurance company it selects for the purchase of the annuities will be one which is generally regarded as very sound in the insurance industry and to be among the class or group of insurance companies which are rated Excellent or better by Best's Guide to Life Insurance Companies, 1982 Edition, published by A.M. Best Company, Oldwick, New Jersey 07830.

* * *

[Paragraph 14] The United States will furnish to [Plaintiffs] . . . a certificate of insurance or other evidence of the purchase by the United States of annuities in an amount sufficient to satisfy those obligations of the United States under this Settlement Agreement which are to be satisfied by the purchase of the annuities.

Id. at 1296-97.

In support of its overall conclusion that the language of the settlement agreement was not ambiguous, id. at 1297-98, the Federal Circuit first found that where the contract provided in paragraph 3 that the United States "agrees to purchase annuities which will pay [certain periodic amounts]," the United States was only agreeing to purchase the annuities, id. at 1297.  The court stated:  "As the sentence's syntax dictates, the phrase 'which will pay' modifies 'annuities,' signaling that the annuities (and not the Government) will pay the future amounts."  Id.

-24-

Second, the Federal Circuit found that although the settlement agreement provided, in paragraph 11, that the "payments by the United States set forth above shall operate as full and complete discharge of all payments to be made," the phrase "payments by the United States" was not intended to modify the sums identified in paragraphs 4-6, which relate to the annuity payments.  Id.  Rather, the court reasoned that the phrase referred instead to the lump sum payments the United States promised to make and that the settlement agreement "[did] not provide for any other 'payments' by the United States."  Id.  In further support of its position, the court noted that the settlement agreement made no mention of the United States in paragraphs 4-6, which reference when certain lump sum payments will be made.  Id.  The court concluded, therefore, that when sections 1 and 2 are read in tandem, the language in paragraph 11 referred to the United States' obligation to pay certain lump sums and that it is the fulfillment of this obligation, along with its obligation to purchase the annuities, which satisfies the United States' responsibilities under the settlement agreement.  Id.

Third, the Federal Circuit found that it would be unreasonable to interpret the settlement agreement as requiring the United States to guarantee the insurance company's future payments in light of the fact that (1) per the terms of the settlement agreement, the Nutts retained standing to sue the insurance company and the United States promised to help if the need arose; and (2) the United States promised "to select a 'very sound' insurance company rated 'excellent or better,'" something it would not have done had the United States been the parties' intended guarantor of payments.  Id. at 1298.

Lastly, the Federal Circuit found that the United States' obligation with regard to the annuities did not extend beyond their purchase: "[P]aragraph 14 of the Agreement . . . states that the Government will furnish to Appellants 'a certificate of insurance or other evidence of the purchase by the United States of annuities in an amount sufficient to satisfy those obligations under the settlement agreement which are to be satisfied by the purchase of the annuities.'"  Id.  Thus, the court reasoned:  "This provision shows that the [United States'] obligations with respect to the future sums that were to be made by the annuities were satisfied 'by the purchase of the annuities.'"  Id.

Unlike the language used by the parties in Nutt, the language used in the instant settlement agreement is ambiguous.  As will be demonstrated below, while certain language within the contract is susceptible to more than one reasonable interpretation, see Barron Bancshares, Inc., 366 F.3d at 1375-76, each interpretation may be viewed as being consistent with the contract as a whole, Enron Fed. Sols., Inc., 80 Fed. Cl. at 394.  Furthermore, that ambiguity is latent because it only became apparent at the point that plaintiffs' four annuity policies were restructured following the ELNY liquidation and plaintiffs subsequently learned that they would be receiving reduced monthly payments.  In this case, the court concludes that the United States intended to act as a guarantor, for a period of twenty years, of the annuity payments to plaintiffs in their individual capacities.  The court reaches this conclusion not by focusing on each section of the contract separately, but by considering the contract in its entirety and following, as it must, the Federal Circuit's reasoning in Nutt.[8]

_____

[8] Although the doctrine of contra proferentem, wherein the risk of ambiguity is shifted to the drafting party, is used to resolve contracts with latent ambiguities, the court need not apply it

On the one hand, the court notes that certain language in the settlement agreement supports an interpretation that the United States did not intend to guarantee plaintiffs' future monthly annuity payments.  Paragraph 4 of the contract states:

> The payment by the United States of America of the cash sums set forth below in paragraph 5 and the purchase of annuities which will to [sic] provide certain future periodic payments as set forth below in paragraph 6 shall constitute a complete release and bar to any and all causes of action, claims, liens, rights, or subrogated interests under the Federal Tort Claims Act, or otherwise, known or unknown to the Plaintiffs or their attorneys, by reason of, or arising from, the events, circumstances or incidents giving rise to this lawsuit.

Settlement Agreement 64-65.  The phrase "which will to [sic] provide" appears, as it did in <u>Nutt</u>, to modify "annuities," rather than the United States, thus leading to the conclusion that payments are to be made by the annuities and not the United States.  Thus, as in <u>Nutt</u>, the foregoing language supports a finding that the United States' obligations under the contract are satisfied by its making lump sum payments and purchasing annuities.[9]

On the other hand, the court notes that certain language in the settlement agreement supports a converse interpretation that the United States did intend to guarantee certain payments to plaintiffs, albeit for a limited period of time.  Specifically, paragraph 6 provides:

> 6.      The annuities purchased by the United States of America shall make the following payments:
>
> (a)      To Raymond A. Shaw, the sum of $4,166.00 each month, continuing for the life of Raymond A. Shaw. These monthly payments are guaranteed for a period of twenty (20) years . . . .

---

in the instant case because the court is able to discern the contract's meaning by reading it in its entirety.  <u>See</u> <u>Gardiner, Kamya & Assocs., P.C.</u>, 467 F.3d at 1352 ("As our predecessor court held more pointedly, <u>contra proferentem</u> is a rule of last resort that is applied only where there is a genuine ambiguity and where, after examining the entire contract, the relation of the parties and the circumstances under which they executed the contract, the ambiguity remains unresolved." (internal quotation marks omitted)).

[9]  In <u>Nutt</u>, while the Federal Circuit concluded that the settlement agreement contained a similar provision, it did so based on a statement in paragraph 11 of that contract, which referred simply to "payments by the United States set forth above," 837 F.3d at 1296, whereas in the instant case, the language of the contract clearly provides that the "payment by the United States of America of the cash sums" refers to those "cash sums set forth below in paragraph 5," and that the "purchase of annuities" refers to those annuities that will "provide certain future periodic payments as set forth below in paragraph 6," Settlement Agreement 64.

> (b)      To Karen L. Shaw, the sum of $4,166.00 each
> month continuing for the life of Karen L. Shaw.
> These payments are guaranteed for a period of
> twenty (20) years . . . .

Id. at 66-67.  Although it is clear that the United States is obligated to purchase certain annuities and that those annuities are to make certain payments to plaintiffs, it is unclear who is the guarantor of those payments.  In this case, because the remaining provisions of paragraph 6 clearly indicate when the obligation to make payment falls to the annuities, the court finds that the twenty-year guarantee present in the first two subparagraphs of paragraph 6 is meant to be borne by the United States.  This is in accord with the Federal Circuit's ruling in Massie, wherein the court found that the United States agreed to guarantee plaintiffs' annuity payments because the settlement agreement expressly stated that the "deferred lump-sum payments . . . are guaranteed" and that the annuity payments "are guaranteed for fifteen (15) years".[10]  Massie, 166 F.3d at 1186-87.  In addition, the settlement agreement currently before the court is between plaintiffs and the United States.  Thus, while a responsibility pursuant to the agreement may be delegated, unless otherwise stated, it remains with one of the contracting parties.  Here, the obligation to guarantee certain payments belongs to the United States.  See id. at 1190.

      In reaching this conclusion, the court recognizes that its interpretation may be viewed as contrary to (1) the language in paragraph 4 of the settlement agreement, that provides that the United States' payment of cash sums and purchase of annuities operates as a complete release of its obligations under the contract; and (2) the language in paragraph 7 of the settlement agreement that identifies the "total, final cost" of the contract as $4.8 million.  However, it is the court's view that the contract may nonetheless be read as a cohesive whole.  First, with respect to paragraph 4, it is true that in order to satisfy its part of the bargain under the contract, the United States had to make two types of expenditures—it had to make certain lump sum payments and it had to purchase four annuities.  The additional obligation to guarantee annuity payments to plaintiffs for twenty years was an obligation that, although it existed at the time the contract was signed, did not require an additional expenditure of money at that time.  Furthermore, only if the company making the annuity payments defaulted on its obligation to make payments pursuant to the schedule would the United States be required to pay plaintiffs any additional monies.

      Second, with respect to paragraph 7, the court acknowledges the United States' argument that if the court were to find that "the United States was still somehow a guarantor, . . . the plain and unambiguous limitation of 'total, final' liability to $4.8 million would be non-sensical." Def.'s Mem. Re: Nutt 9.  However, this apparent inconsistency did not trouble the Federal Circuit in Massie.  In that case, the settlement agreement provided:

---

[10]  As noted previously, in Nutt, the Court of Claims held that Massie was not controlling because it involved an MCA claim as opposed to an FTCA claim.  837 F.3d at 1298.  When the case was appealed to the Federal Circuit, however, the court in Nutt dismissed the trial court's rationale and held instead that Massie was not controlling because the Nutt contract did not contain "guarantee language" whereas the Massie contract did.  Id. at 1299.

> The United States hereby agrees to utilize a sum not to exceed
> ONE MILLION THREE HUNDRED THOUSAND DOLLARS
> AND NO CENTS ($1,300,000.00) according to the plan set forth
> in the document, and the Offerees hereby agree to accept this plan
> in full satisfaction and final settlement of any and all claims, liens,
> rights, or subrogated interests the Offerees now have or in the
> future may have against the United States, its officers, agents, or
> employees, for personal injury alleged to have resulted from
> medical malpractice during the birth of Autumn Massie at the
> United States Naval Hospital, Naples, Italy, on June 8, 1983.

Massie v. United States, 40 Fed. Cl. 151, 155 (1997).  Despite this clearly stated cap on damages, the Federal Circuit ruled—without elaboration (or discussion)—that the United States had agreed to guarantee plaintiffs' future annuity disbursements.  Massie, 166 F.3d at 1190.

Third, the court notes that certain language in the Nutt settlement agreement—language the Federal Circuit pointed to as evidence that the United States did not intend to guarantee plaintiffs' monthly annuity payments—is not present in the instant contract.  For example, paragraph 11 of the Nutt contract stated:

> [I]f the insurance company hereinafter referred to defaults in the
> performance of its obligations under the annuity agreement with
> the United States, [Plaintiffs] . . . shall have standing to sue the
> said insurance company for breach of contract.  In such event, the
> United States shall assist [Plaintiffs], their heirs or personal
> representatives, in the prosecution of said suit to the extent
> permitted by applicable laws and regulations.

937 F.3d at 1296-97.  As noted by the Federal Circuit in that case, the plaintiffs would have no need to retain standing to sue the insurance company if the annuity payments were guaranteed by the United States.  In addition, paragraph 12 of the Nutt contract stated:

> The United States represents to [Plaintiffs] that the insurance
> company it selects for the purchase of the annuities will be one
> which is generally regarded as very sound in the insurance industry
> and to be among the class or group of insurance companies which
> are rated Excellent or better by Best's Guide to Life Insurance
> Companies . . . .

Id. at 1297.  Again, as the Federal Circuit noted in Nutt, the plaintiffs would have no need for a "sound" insurance company with an "Excellent or better" rating if the annuity payments were guaranteed by the United States.  Lastly, paragraph 14 stated:

> The United States will furnish to [Plaintiffs] . . . a certificate of
> insurance or other evidence of the purchase by the United States of
> annuities in an amount sufficient to satisfy those obligations of the

> United States under this Settlement Agreement which are to be
> satisfied by the purchase of the annuities.

Id. Once more, as recognized by the Federal Circuit in Nutt, plaintiffs would have no need of proof that the annuities were purchased if the United States' obligations extended beyond the purchase.

### 3. Plaintiffs Lack Standing to Sue on Behalf of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust

In its motion for partial summary judgment, defendant argues that plaintiffs lack standing to sue on behalf of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust. The court agrees.

As noted above, the instant settlement agreement provides for the creation of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust. Settlement Agreement 65. The settlement agreement further provides that the United States is to make a lump sum payment to the trustee of the medical care trust, id. at 65-66, and that one of the annuities purchased by the United States is to provide future monthly payments—in two different amounts—to the trustee of the medical care trust, id. at 66-67. Finally, the settlement agreement provides that "[u]pon the death of Richard Scott Shaw the Trust Estate shall revert to the United States." Id. at 65. The trust agreement, in turn, provides detailed instructions for the distribution of the trust's net income and principal, management of the trust, and termination of the trust. Trust Agreement 50-61. Significantly, the trust agreement provides that the trustee "shall have and exercise the exclusive management and control of such Trust," to include the power "to enforce, defend against, compromise or settle any claims by or against the Trust." Id. at 57-58. Because plaintiffs fail to identify any language within either the settlement agreement or the trust agreement that suggests that anyone other than the trustee has the power to manage the trust, plaintiffs' attempt to assert a claim on behalf of the trust fails. Indeed, unless otherwise indicated, a trustee is possessed with the basic power to file suit on behalf of the trust and its beneficiary:

> The trustee is a proper party to assert the claims of a trust for any
> damages sustained to the trust during the term of the trust, and, as a
> general rule, the trustee is a proper person to sue or be sued on
> behalf of a trust. It is within the trustee's power, and a duty of the
> trustee, to institute actions and proceedings for the protection of
> the trust estate and the enforcement of claims and rights belonging
> to the estate and to take all steps as are reasonably necessary.

76 Am. Jur. 2d Trusts § 597 (2016); accord Restatement (Second) of Trusts § 192 (Am. Law. Inst. 1959) ("The trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property, provided that in so doing he exercises reasonable prudence."); see also Chauffers, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558, 567 (1990) ("In most cases, a trustee has the exclusive authority to sue third parties who injure the beneficiaries'

interest in the trust . . . .").  In short, plaintiffs lack standing to assert claims on behalf of the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust.

### 4.  Plaintiffs' Breach of Contract Claim Fails With Respect to the Future Monthly Annuity Payments to Plaintiffs and to Their Son's Guardianship

In addition to claiming that defendant breached the settlement agreement by failing to pay or guarantee payment of the deferred monthly and future lump sum payments under the Richard Scott Shaw Irrevocable Reversionary Medical Care Trust, Compl. ¶ 5.1(c)-(d), plaintiffs also claim that defendant breached the settlement agreement with respect to the future monthly annuity payments to Karen L. Shaw, Raymond A. Shaw, and the Richard Scott Shaw Guardianship, id. at ¶ 5.1(b).

As noted above, the United States' sole obligation to plaintiffs, as memorialized in sections (a) and (b) of paragraph 6 of the settlement agreement between plaintiffs and the United States, was to guarantee payments to each of them individually for a twenty-year period, which began in 1985 and ended in 2005.  Thus, no cause of action as to this provision of the contract remains.  See Trevor Langkamp v. United States, No. 15-764C, 2017 Wl 1046531, at *9 (Mar. 20, 2017) (noting that even if the plaintiff had argued that the United States was obligated to guarantee certain monthly payments for a fifteen-year period, the fifteen years had passed with all of the monthly payments having been made in full).

Likewise, no cause of action remains as to section (d) of paragraph 6 of the settlement agreement.  That section provides for monthly payments "[t]o Richard Scott Shaw, through his guardians ad litem or other appointed representative(s)," for his life.  Settlement Agreement 67.  Unlike the monthly annuity payments to Richard Scott Shaw's parents, however, his payments were not guaranteed by the government for any period of time.  Thus, while plaintiffs have proven that there exists a valid contract between the parties, plaintiffs have failed to prove that defendant has any outstanding obligation or duty arising from that contract, see San Carlos Irrigation & Drainage Dist., 877 F.2d at 959, to make up the shortfall in payments to plaintiffs and to the Richard Scott Shaw guardianship resulting from the liquidation of ELNY.[11]

## IV.  CONCLUSION

In sum, the court **DENIES** plaintiffs' motion for partial summary judgment on liability and **GRANTS** defendant's cross-motion for partial summary judgment on liability pursuant to RCFC 56.[12]  Because plaintiffs cannot, as a matter of law, succeed on their breach-of-contract claims, the court **DISMISSES** their complaint with prejudice.  No costs.  The clerk shall enter judgment accordingly.

---

[11]  Having concluded that all of plaintiffs' breach of contract claims fail, the court need not address defendant's argument regarding accord and satisfaction.

[12]  Although the government moved for partial summary judgment, this ruling resolves all issues pending before the court.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge